HAILE ABEBE,                              )
        *Plaintiff*,                      )
                                          )
        *vs.*                             )        1:15-cv-00206-JMS-DKL
                                          )
THERMO FISHER SCIENTIFIC, INC.,           )
        *Defendant*.                      )

## **ORDER**

Plaintiff Haile Abebe worked at Eli Lilly and Company ("Lilly") for seventeen years as a scientist, holding various positions.  In March 2010, Lilly outsourced certain services related to clinical drug trials to Defendant Thermo Fisher Scientific, Inc. ("Thermo Fisher").  Subsequently, Thermo Fisher hired Mr. Abebe, along with several other Lilly employees.  While a Thermo Fisher employee, Mr. Abebe applied for numerous positions within Thermo Fisher, complained internally about discriminatory treatment after not being chosen for the positions, and obtained several right to sue letters from the Equal Employment Opportunity Commission ("EEOC") along the way.  Mr. Abebe remained a Thermo Fisher employee until all positions within his department were reabsorbed by Lilly and eliminated by Thermo Fisher in early 2015.  He rejected a severance package from Thermo Fisher that required signing a release, and initiated this lawsuit in February 2015, asserting claims for violations of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act ("ADEA"), and 42 U.S.C. § 1981.  Specifically, Mr. Abebe claims that Thermo Fisher discriminated against him on the basis of his gender, age, race, and national origin, and that it retaliated against him for complaining about the discrimination.

Presently pending before the Court are: (1) a Motion for Summary Judgment filed by Thermo Fisher, [Filing No. 79]; and (2) a Motion to Strike Plaintiff's Surreply in Opposition to

Defendant's Motion for Summary Judgment, [Filing No. 100].  Both motions are now ripe for the Court's review.

<h1 style="text-align:center">I.</h1>

<strong>MOTION TO STRIKE MR. ABEBE'S SURREPLY</strong>

Before analyzing the substantive arguments Thermo Fisher raises in its Motion for Summary Judgment, the Court will consider Thermo Fisher's Motion to Strike Surreply in Opposition to Defendant's Motion for Summary Judgment.  [Filing No. 100.]  This is necessary because the motion relates to the scope of information that the Court could consider in deciding the Motion for Summary Judgment.

Mr. Abebe filed a twenty-one page Surreply in Opposition to Defendant's Motion for Summary Judgment on December 8, 2016.  [Filing No. 99.]  Thermo Fisher moved to strike the surreply, arguing that the surreply was untimely, and that if it is permitted it should be limited to addressing the only new evidence Thermo Fisher submitted with its reply brief – the Second Declaration of Virginia Campbell.  [Filing No. 100 at 2-3.]

In response, Mr. Abebe argues that his surreply was not untimely because Thermo Fisher served the reply brief when the old version of Federal Rule of Civil Procedure 6(d) – providing for three extra days for responding to an electronic filing – was in effect.  [Filing No. 101 at 5.]  Mr. Abebe also argues that Thermo Fisher "objected" to his evidence by arguing that it constituted offering a personal opinion, so he was entitled to address that evidence.  [Filing No. 101 at 2.]  Mr. Abebe contends that Thermo Fisher makes new arguments in its reply, and that he should be able to address them based on "due process and fundamental fairness."  [Filing No. 101 at 3.]

On reply, Thermo Fisher argues that it did not object to Mr. Abebe's evidence in its reply brief, but merely argued that his evidence was not sufficient to overcome summary judgment.  [Filing No. 102 at 2.]  Further, it asserts that the version of Federal Rule 6(d) in effect when the

surreply was filed governs the timing of the surreply and, consequently, it was untimely. [Filing No. 102 at 3-4.]

As to timeliness, the Court notes that Thermo Fisher filed its reply brief on November 28, 2016, when the old version of Rule 6(d) was in effect. [Filing No. 98.] The Court finds it reasonable to apply the deadline set forth in the old version of Rule 6(d), since that version governed on that date. *See* Fed. R. Civ. P. 6(d) (version of the rule in effect before December 1, 2016 providing that "[w]hen a party may or must act within a specified time after service and service is made under Rule 5(b)(2)(C), (D), (E), or (F), 3 days are added after the period would otherwise expire under Rule 6(a)". Accordingly, Mr. Abebe timely filed his surreply on December 8, 2016 – ten days after service of Thermo Fisher's reply brief.

As to the scope of the surreply, Local Rule 56-1(d) permits the filing of a surreply "only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." Thermo Fisher concedes that it submitted, and cited to, the Second Declaration of Virginia Campbell for the first time in its reply brief. Mr. Abebe is permitted to address that declaration in a surreply. The Court rejects Mr. Abebe's argument, however, that Thermo Fisher generally objected to the admissibility of all of his evidence as expressing his personal opinion in its reply, so he is permitted to discuss that evidence again in his surreply. Thermo Fisher does not object to the admissibility of Mr. Abebe's evidence, but argued instead that the evidence is not sufficient because it merely constitutes Mr. Abebe's opinion. Admissibility and sufficiency are distinctly different concepts, and Mr. Abebe cannot address the latter in a surreply.

The Court **GRANTS IN PART** Thermo Fisher's Motion to Strike, [Filing No. 100], to the extent that it strikes the portions of Mr. Abebe's surreply that do not relate to the Second Declara-

tion of Virginia Campbell, but **DENIES IN PART** the Motion to Strike to the extent that it de-clines to strike the portions of the surreply that relate to the Second Declaration of Virginia Camp-bell. The Court notes that only three sentences of Mr. Abebe's 21-page surreply address that issue. [*See* Filing No. 99 at 4 (Mr. Abebe addressing Lillian Knarr's resume, which was submitted with the Second Declaration of Virginia Campbell).][1]

## II.
### MOTION FOR SUMMARY JUDGMENT

#### A. Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affi-davits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or decla-rations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

---

[1] Ultimately the Motion to Strike is inconsequential because, as discussed in detail below, the Court finds that Mr. Abebe did not allege claims related to the 2012 Clinical Supply Chain Man-ager positions so will not consider those positions. The Second Declaration of Virginia Campbell relates exclusively to those positions.

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

**B. Statement of Facts**

The following statement of facts was evaluated pursuant to the standards set forth above, that is, they are either undisputed or presented in the light most favorable to Mr. Abebe:

*1. Mr. Abebe's Background and Employment at Lilly*

Mr. Abebe is a black male of Ethiopian descent, who was born in 1953. [Filing No. 57 at 2; Filing No. 93-4 at 2.] He has a Bachelor's Degree in Agriculture, a Master's Degree in Soil Microbial Ecology, a Master's Degree in Microbiology, and has completed course work toward a PhD in Microbiology. [Filing No. 93-4 at 9-10.]

Mr. Abebe began working for Lilly in 1995 as a Technical Services Representative, and received several promotions within Lilly over the next several years, culminating with his promotion to a Manager of Clinical Trial Support Operations in August 2009. [Filing No. 93-10 at 6-15.] During his employment at Lilly, Mr. Abebe received good performance evaluations.[2] [Filing No. 93-9.]

---

[2] Mr. Abebe sets forth several facts related to his performance while at Thermo Fisher including, among others, negative comments on his Professional Track Performance Development Summary, [Filing No. 96 at 4-5], Thermo Fisher's attempt to put him on a Performance Improvement Plan, [Filing No. 96 at 5], Thermo Fisher placing him on a Performance Coaching Plan, [Filing No. 96 at 5-6], Thermo Fisher changing his direct supervisor after he returned from medical leave, [Filing No. 96 at 6], and some emails that were missing from his records, [Filing No. 96 at 9]. Thermo Fisher has not argued that it did not select Mr. Abebe for the positions for which he applied because he had performed poorly in the past, but rather argues that it found another candidate to be more qualified. Additionally, Mr. Abebe does not present any evidence linking these performance-related facts to Thermo Fisher's decisions that are the subject of the lawsuit. Because these facts are irrelevant to the Motion for Summary Judgment, the Court need not, and will not, consider them.

2. *Mr. Abebe's Employment At Thermo Fisher*

a. <u>Initial Position With Thermo Fisher</u>

In March 2010, Lilly outsourced its clinical trial drug manufacturing and packaging, known as New Drug Product Trial Support ("<u>NDPTS</u>"), to Thermo Fisher, which had provided those services on-site at Lilly. [<u>Filing No. 93-10 at 1</u>.] Thermo Fisher contacted Lilly employees whose positions were being eliminated due to the outsourcing, inviting them to submit their resumes for consideration for a position at Thermo Fisher. [<u>Filing No. 93-10 at 1</u>.] Mr. Abebe completed an application for employment at Thermo Fisher, stating that he was seeking a manager position. [<u>Filing No. 93-10 at 2-5</u>.]

On April 29, 2010, Thermo Fisher offered Mr. Abebe the position of Senior NDP Trial Support Associate, at an annual salary of $92,000. [<u>Filing No. 93-10 at 16-17</u>.] Michael McNear, then General Manager of Thermo Fisher's Indianapolis facility, made the decision to hire Mr. Abebe. [<u>Filing No. 79-5 at 1</u>.] Mr. Abebe had a long tenure with Lilly, and Thermo Fisher offered him a salary that was significantly higher than other employees in similar positions with Thermo Fisher because Thermo Fisher wanted to provide him with a salary that was comparable to what he had earned at Lilly. [<u>Filing No. 79-2 at 2</u>.] Thermo Fisher also gave Mr. Abebe the title of Senior NDPTS Associate, although his day-to-day job duties were the same as the other NDPTS Associates. [<u>Filing No. 79-2 at 2</u>.] Although Mr. Abebe's position at Lilly as Clinical Trial Support Manager was a supervisory role on Lilly's NDPTS team, Thermo Fisher did not have a comparable position in its NDPTS group. [<u>Filing No. 79-2 at 1-2</u>.] Mr. Abebe accepted Thermo Fisher's employment offer on May 5, 2010. [<u>Filing No. 93-10 at 17</u>.] He was fifty-six years old at the time. [<u>Filing No. 93-4 at 2</u>.] Mr. Abebe began working in his new position at Thermo Fisher in July 2010. [<u>Filing No. 93-4 at 19</u>.]

In April 2011, Mr. Abebe's salary increased to $93,389.20. [Filing No. 79-2 at 2.]

### b. Client Services Manager and NDPTS Team Leader Positions

In September 2011, Thermo Fisher posted a position for Client Services Manager and Mr. Abebe applied. [Filing No. 79-2 at 2.] Thermo Fisher ultimately selected Mishel Dyas for the Client Services Manager position. [Filing No. 79-3 at 2.] Also in September 2011, Mr. Abebe applied for an NDPTS Team Leader position. [Filing No. 79-2 at 2.] Thermo Fisher selected Thomas Turner for the position. [Filing No. 79-2 at 3.] Ms. Dyas was offered a salary of $79,279 for the Client Services Manager position, and Mr. Turner was offered a salary of $69,229 for the NDPTS Team Leader position – both lower than Mr. Abebe's then-current salary of $93,389.20. [Filing No. 79-2 at 2-3.]

### c. Mr. Abebe Expresses Concerns About the Hiring Process

In October 2011, Mr. Abebe contacted Virginia Campbell, Human Resources Generalist at Thermo Fisher, to express his concerns regarding the hiring process for the Client Services Manager and NDPTS Team Leader positions, and to suggest that he was not selected for either position for discriminatory reasons. [Filing No. 79-2 at 3.] Ms. Campbell and Steve Yoder, General Manager of Thermo Fisher, met with Mr. Abebe to discuss his concerns, and Mr. Abebe continued to voice his concerns after the meeting. [Filing No. 79-2 at 3.]

Consequently, in early 2012 Thermo Fisher assigned Kimberly Bardellini, Human Resources Manager, to investigate Mr. Abebe's complaints. [Filing No. 79-2 at 3.] Ms. Bardellini reviewed numerous documents including the job descriptions for the positions, written statements, email correspondence, interview notes, Mr. Abebe's application and resume, and the applications and resumes of the other applicants. [Filing No. 79-4 at 1-2.] Mr. Bardellini also interviewed Mr. Abebe, Mr. Yoder, Ms. Campbell, Ms. Dyas, and Mr. Turner. [Filing No. 79-4 at 1-2.] Ultimately,

she did not find any evidence to substantiate Mr. Abebe's complaints or to suggest that he was not selected for the positions due to discriminatory reasons. [Filing No. 79-4 at 2.]

### d. Clinical Supply Chain Manager Positions

In January 2012, Mr. Abebe applied for a Clinical Supply Chain Manager position, for which there were two openings. [Filing No. 79-2 at 3.] Thermo Fisher selected Lindsay Simmons and Susie Haros for those positions. [Filing No. 79-5 at 1.] Thermo Fisher offered Ms. Simmons a salary of $77,625, and offered Ms. Haros a salary of $80,000 – both lower than Mr. Abebe's then-current salary of $93,389.20. [Filing No. 79-2 at 2-3.]

### e. Mr. Abebe's Mistake and Leave of Absence

One of the key functions of the NDPTS group is to "allocate[e] drugs appropriately for clinical drug trials." [Filing No. 79-1 at 2.] In early March 2012, Mr. Abebe failed to properly reconcile how much of a particular drug was available, which resulted in Thermo Fisher being unable to fill an order for the drug from Lilly. [Filing No. 79-6 at 2-3.] In March 2012, after the incident, Mr. Abebe requested a medical leave of absence. [Filing No. 79-2 at 4.] He remained on leave until May 14, 2012, when he returned to his Senior NDPTS Association position. [Filing No. 79-2 at 4.] When he returned from his leave of absence, Mr. Abebe felt that his co-workers treated him differently. [*See* Filing No. 93-22.]

### f. Mr. Abebe's First EEOC Charge

Meanwhile, in April 2012, Mr. Abebe filed a charge of discrimination with the EEOC relating to Thermo Fisher's decision not to hire him for the positions he had applied for from September 2011 to March 2012. [Filing No. 79-2 at 4; Filing No. 84 at 20.] Specifically, Mr. Abebe stated that the alleged discrimination took place from September 29, 2011 to March 12, 2012, and summarized his claim as follows:

I am a 58 year old black male of Ethiopian descent with a disability, who started working for the Company in July, 2010. My present position with the Company is that of Senior NDPTS Associate. Over the past year, I have applied for several promotional positions with the organization. I have not, however, been selected for any of the positions for which I have applied. All of the successful candidates have had far less managerial, technical, pharmaceutical and scientific experience; far less qualified than me in the position for which I applied. The successful candidates have also been younger, white, mostly female, American and non-disabled. I questioned management about my non-selection. I further requested of management an investigation into the suspect promotional practice. I went so far as to put management on notice that I believed the selections were made on discriminatory bases. I was informed the Company found no discrimination. After complaining, I was placed on a bogus and false coaching plan that prevented me from being considered for other opportunities within the Company. I was further informed by Charles Pinto, Executive Director of Human Resources, that I had three options regarding my future with the organization – I could either stay, relocate to another state or leave.

I believe I have been discriminated against by not being promoted because of my age, gender, race, national origin and disability.[3] I further believe I have been retaliated against because I complained of the discriminatory activity to management, all in violation of Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, as amended, and the Americans with Disabilities Act of 1990, as amended.

[Filing No. 84 at 20.]

The EEOC dismissed Mr. Abebe's charge, and issued a Notice of Right to Sue ("Right to Sue Letter") on December 6, 2012. [Filing No. 79-2 at 4; Filing No. 79-2 at 17.] Mr. Abebe did not file a lawsuit relating to the three positions that were the subject of his April 2012 EEOC Charge within the 90-day deadline provided in the December 6, 2012 Right to Sue Letter.

g. The Client Services Manager Position Becomes Available

In April 2013, Thermo Fisher increased Mr. Abebe's salary to $95,257. [Filing No. 79-2 at 2.]

---

[3] While Mr. Abebe referenced discrimination based on a disability in his EEOC Charge, he did not identify what the disability was, and has not made that claim in this lawsuit.

In October 2013, a Client Services Manager position became available and Mr. Abebe applied. [Filing No. 79-1 at 2.] Jennifer Griffith, who was the Director of Client Services at the time, was the Hiring Manager for the position. [Filing No. 79-1 at 2.] She "was specifically looking for someone with experience with Thermo Fisher's practical process improvement ('PPI') process, a multi-step problem solving method that Thermo Fisher utilizes and highly values, for the Client Services Manager position." [Filing No. 79-1 at 2.] Ms. Griffith and Jody King, Director of Operations, interviewed three candidates for the position, including Mr. Abebe. [Filing No. 79-1 at 2.] Both Ms. Griffith and Mr. King ranked Mr. Abebe last in terms of interview score, noting that Mr. Abebe lacked PPI experience, that Mr. Abebe did not understand the role of Client Services Manager and had not sought out information about the role before the interview, that Mr. Abebe did not answer their questions clearly nor provide specific examples during his interview, and that he could not "appropriately articulate examples of improvement initiatives, financial or contract experience, or leadership impact." [Filing No. 79-1 at 2; Filing No. 79-1 at 4-12; Filing No. 79-7 at 1-2; Filing No. 79-7 at 4-9; Filing No. 79-12 at 5.]

Ms. Griffith selected Mr. Turner for the position because he had PPI experience, had relevant educational experience, performed well during his interview, and had a track record of successful leadership at Thermo Fisher. [Filing No. 79-1 at 2.] Thermo Fisher offered Mr. Turner a salary of $88,600 in connection with the Client Services Manager position – less than Mr. Abebe's $95,257 salary. [Filing No. 79-2 at 2-4.]

h. Lilly Notifies Thermo Fisher of Plan to Cease Outsourcing and Thermo Fisher Notifies its Affected Employees

In late 2013, Lilly notified Thermo Fisher that it had decided to re-absorb some of the functions it had outsourced to Thermo Fisher, including all functions performed by the NDPTS group. [Filing No. 79-2 at 4.] Lilly was the only client Thermo Fisher serviced in Indianapolis,

and the source of all of the work for Thermo Fisher's NDPTS group.  [Filing No. 79-2 at 4.]  As a result, Thermo Fisher decided to eliminate all of the positions that Lilly would no longer be out-sourcing.  [Filing No. 79-2 at 4.]  This decision impacted twenty-five Thermo Fisher employees, including Mr. Abebe and the nine other members of Thermo Fisher's NDPTS group.  [Filing No. 79-2 at 4.]

On December 3, 2013, Thermo Fisher held a meeting with Mr. Abebe and the twenty-four other affected employees to notify them that their positions would be eliminated over the next fifteen months, with elimination of all positions in the NDPTS group to take effect on March 31, 2015.  [Filing No. 79-2 at 4.]  At the meeting, Thermo Fisher offered the affected employees a retention bonus if they remained employed through March 31, 2015.  [Filing No. 79-2 at 4.]  It offered every member of the NDPTS group, including Mr. Abebe, the same retention bonus of $57,750.  [Filing No. 79-2 at 4.]

i.   Team Leader, Operations Support Position

Later in December 2013, Thermo Fisher sought a Team Leader, Operations Support, and Mr. Abebe applied.  [Filing No. 79-7 at 2.]  Mr. King was the Hiring Manager, and the position involved supervising the Operations Support group, which was responsible for receiving, staging, and packaging the materials (caps, bottles, and syringes, for example) needed for orders.  [Filing No. 79-7 at 2.]  Mr. King did not consider the position to be science-based, but rather was looking for individuals with operations and supply chain experience.  [Filing No. 79-7 at 2.]

Mr. King conducted the interviews, along with Cindy Calvert, Team Leader for Clinical Packaging.  [Filing No. 79-7 at 2.]  Both Mr. King and Ms. Calvert ranked Mr. Abebe the lowest among the candidates that they interviewed.  [Filing No. 79-7 at 2.]  Mr. King found Mr. Abebe to not be very interested in the position.  [Filing No. 79-7 at 2.]  In contrast, Adam Craig – who Mr.

King ultimately selected for the position – was interested in, and excited about, the position in his interview. [Filing No. 79-7 at 2.] He also had the technical and supply chain experience necessary for the position, and Mr. King felt that his previous employment with Roche Diagnostics, in a manufacturing setting, had similarities to the Team Leader, Operations Support position. [Filing No. 79-7 at 2.] Mr. King did not think that Mr. Abebe had comparable experience. [Filing No. 79-7 at 2.] Thermo Fisher offered Mr. Craig a salary of $65,000 for the Team Leader, Operations Support position – less than Mr. Abebe's $95,257 salary. [Filing No. 79-2 at 2; Filing No. 79-2 at 5.]

j.    Quality Assurance Representative Position

Also in December 2013, Thermo Fisher sought a Quality Assurance Representative and Mr. Abebe applied for the position. [Filing No. 79-8 at 2.] The primary duty of the Quality Assurance Representative was to carefully review manufacturing and packaging production records to ensure that the records are accurate and error-free. [Filing No. 79-8 at 1.] The Quality Assurance Representative position involved checking the documentation and records created during the manufacturing and/or packaging of clinical trial materials, and ensuring that all records are completely accurate in the event of an audit by Lilly or a regulatory agency. [Filing No. 79-8 at 1-2.] The position required a close attention to detail, and was not a supervisory position. [Filing No. 79-8 at 2; Filing No. 79-8 at 4-7.]

Bryan Spindler, Director of Quality Assurance, supervised the Quality Assurance Representatives at the time and was the Hiring Manager for the Quality Assurance Representative position. [Filing No. 79-8 at 1-2.] Two then-current Quality Assurance Representatives conducted the first round of interviews, and then Mr. Spindler conducted a second round of interviews with all three candidates, including Mr. Abebe. [Filing No. 79-8 at 2.] Mr. Spindler felt that Mr. Abebe

was not excited about the position during the interview, and also noticed several grammatical and typographical errors on Mr. Abebe's resume. [Filing No. 79-8 at 2.] Mr. Spindler felt that these errors indicated a lack of attention to detail – a key requirement for the position. [Filing No. 79-8 at 2.]

Mr. Spindler selected Mindy Fultz for the Quality Assurance Representative position. [Filing No. 79-8 at 2.] She has an undergraduate degree in business administration, was enthusiastic about the position during her interview, and her resume was free of grammatical and typographical errors. [Filing No. 79-8 at 2; Filing No. 79-8 at 19-20.] Ms. Fultz has held leadership positions at Thermo Fisher, including Team Leader, Drug Supply Coordination, and Team Leader, Operations Support positions, and had a wide variety of experience which Mr. Spindler felt made her well-rounded and a good fit for the position. [Filing No. 79-8 at 2.] Mr. Spindler also had had positive interactions with Ms. Fultz before, and was impressed with her work performance. [Filing No. 79-8 at 2.] The salary range for the Quality Assurance Representative position was $55,000 to $65,000, but Ms. Fultz had been working at a higher salary at Thermo Fisher because – as was the case with Mr. Abebe – she was hired from Lilly, and had been in a higher salary range while there. [Filing No. 79-2 at 5.] The salary Thermo Fisher offered Ms. Fultz for the Quality Assurance Representative position, $93,317, was still lower than Mr. Abebe's then-current salary of $95,257. [Filing No. 79-2 at 2; Filing No. 79-2 at 5.]

### k. Associate Clinical Supply Chain Manager

Thermo Fisher posted an opening for an Associate Clinical Supply Chain Manager in December 2013, for which Mr. Abebe applied. [Filing No. 79-2 at 5; Filing No. 79-2 at 18-21.] Thermo Fisher interviewed two individuals, but ultimately cancelled the requisition, and the position was never filled. [Filing No. 79-2 at 5; Filing No. 93-28 at 1-2.]

l.  Mr. Abebe Again Expresses Concern About Thermo Fisher's Hiring Decisions

In February 2014, Mr. Abebe again complained to Ms. Campbell that Thermo Fisher had discriminated against him by not selecting him for the positions for which he had applied.  [Filing No. 79-2 at 5; Filing No. 93-28 at 3-5.]  Thermo Fisher's Vice President of Human Resources, Karen Wilson, reviewed the hiring process relating to the positions Mr. Abebe had sought, and determined that in each instance the candidate Thermo Fisher ultimately selected was chosen for legitimate, non-discriminatory reasons, and that there was no evidence of unlawful discrimination. [Filing No. 79-9 at 1-2.]  Ms. Wilson notified Mr. Abebe of her findings in March 2014.  [Filing No. 79-9 at 2.]  Also in March 2014, Mr. Abebe's salary increased to $97,162.  [Filing No. 79-2 at 2.]

m.  Mr. Abebe's Second EEOC Charge

In July 2014, Mr. Abebe filed a second EEOC Charge alleging discrimination that took place in February 2014.  [Filing No. 84 at 21.]  Mr. Abebe stated:

> I have applied for promotion to Team Leader of Material Operation Support, Manager of Client Services, Associate Clinical Supply Chain Manager, and Quality Assurance Representative.  ThermoFisher Scientific has promoted Thomas Turner, Michell Dyes (sic), Adam Craig, Mindy Fultz, Lilian Knarr, Brooke Sanders, and Austin Tan, Christy Owens and Ken Christiansen, who are all younger, white Americans.
>
> I believe I was denied high profile assignment despite my education, experience and expertise and promotion based on my age…, race (black), national origin (Ethiopian), and in retaliation for engaging in protected activity in violation of my rights under the Age Discrimination in Employment Act and Title VII of the Civil Rights Act of 1964 as amended.

[Filing No. 84 at 21.]  In November 2014, the EEOC dismissed Mr. Abebe's Charge and issued a Right to Sue Letter.  [Filing No. 79-2 at 5; Filing No. 79-2 at 22.]

n.  Clinical Supply Chain Manager Position

In late 2014, Mr. Abebe applied for a Clinical Supply Chain Manager position.  Mr. Abebe and seven other candidates were interviewed for the position in January 2015.  [Filing No. 79-5 at 2.]  Thermo Fisher ultimately hired Robert Lozito, who had significant experience in the pharmaceutical industry, including nine years of supply chain management experience that was directly relevant to the position.  [Filing No. 79-5 at 2.]  Mr. Lozito has undergraduate degrees in biology and anthropology, and graduate degrees in pharmacology/physiology and business administration.  [Filing No. 79-5 at 2.]  Mr. Abebe did not have comparable experience in supply chain management.  [Filing No. 79-5 at 2.]  Mr. Lozito is a white male who was fifty-seven years old when he was hired.  [Filing No. 79-2 at 5.]  Thermo Fisher offered Mr. Lozito a salary of approximately $2,000 less than Mr. Abebe's then-current $97,162 salary.  [Filing No. 79-2 at 2; Filing No. 79-2 at 5.]

o.  The NDPTS Group Positions are Terminated

In early 2015, it became clear to Thermo Fisher that transitioning the NDPTS group back to Lilly was taking longer than expected, and that the positions would not be transitioned by March 31, 2015 as originally planned.  [Filing No. 79-1 at 3.]  Accordingly, Ms. Griffith and Ms. Campbell met with Mr. Abebe on March 2, 2015 and offered him a severance package, an additional retention bonus, and the opportunity to extend his position elimination date to July 31, 2015 provided he executed a separation agreement and release.  [Filing No. 79-1 at 3.]  The same offer was presented to all members of the NDPTS group, and they were also required to execute a separation agreement and release in order to receive the enhanced benefits.  [Filing No. 79-1 at 3; Filing No. 79-2 at 6.]  Mr. Abebe was given 45 days to accept or reject the offer, and ultimately decided to

reject it. [Filing No. 79-2 at 6.] On April 17, 2015, his position was eliminated and his employment ended. [Filing No. 79-2 at 6.]

      p.   <u>Mr. Abebe Files the Lawsuit</u>

Mr. Abebe initiated this lawsuit on February 11, 2015, [Filing No. 1], and filed the operative Supplemental Complaint and Demand for Jury Trial (the "Complaint") on May 6, 2016, [Filing No. 57]. Mr. Abebe alleges claims for: (1) discrimination based on his race, national origin, gender, and age under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, and the ADEA , 29 U.S.C. § 621; and (2) retaliation under 42 U.S.C. § 1981, 42 U.S.C. § 2000e-3, and 29 U.S.C. § 621. [Filing No. 57 at 5-7; *see also* Filing No. 34 (Mr. Abebe's Statement of Claims).]

      q.   <u>Mr. Abebe's Third EEOC Charge</u>

In July 2015, Mr. Abebe filed a third EEOC Charge in which he complained of discrimination from 2011 to present and stated in part:

> I complained about the discrimination and retaliation. Instead of correcting the discrimination and retaliation, the employer discriminated and retaliated against me. The employer did not conduct my performance reviews like those of other employees and also the employer gave me a bad review. The employer denied me a merit pay raise for 2014. The employer made allegations against me that were false. The employer caused other employees not to speak to me like they had spoken to me before. In about March 2015, the employer told me that if I did not release all of my claims against the employer, the employer would terminate my employment in April 2015. I did not release all of my claims against the employer. The employer terminated my employment effective April 17, 2015. The employer allowed employees who had not complained about discrimination to continue working. The employer did not allow me to continue working. The employer denied me a retention bonus. The employer denied me severance pay.

[Filing No. 84 at 23.] The EEOC issued a dismissal and Right to Sue Letter in February 2016. [Filing No. 79-2 at 6; Filing No. 79-2 at 23.]

### C. Discussion

#### 1. *Scope of Mr. Abebe's Claims*

At the outset, the Court finds it necessary to address the scope of Mr. Abebe's claims because the parties' briefs exhibit a disconnect regarding this issue. On the one hand, Thermo Fisher argues that Mr. Abebe's claims are limited to: "(1) Thermo Fisher's failure to promote him with respect to the October 2013 Client Services Manager position, as well as some or all of the positions for which he subsequently applied prior to his position elimination in April 2015; (2) the denial of a retention bonus 'of about one year's salary;' (3) the denial of severance; (4) the denial of an 'extension of his employment to July 2015;' and (5) the elimination of his position." [Filing No. 80 at 17-18.] On the other hand, in his brief Mr. Abebe addresses his initial hiring at Thermo Fisher, along with every position for which he applied going forward. Two issues are at play here – first, whether Mr. Abebe alleged claims relating to all of those positions in his Complaint and second, whether some of those claims are time-barred in any event. The Court will address each issue in turn.

##### a. Claims Alleged in the Complaint

Thermo Fisher argues that the Complaint does not address any of the positions for which Mr. Abebe applied before his April 2012 EEOC Charge, so Mr. Abebe "has chosen not to pursue claims relating to those positions." [Filing No. 80 at 17.] Thermo Fisher notes that the first position Mr. Abebe addresses in the Complaint is the October 2013 Client Services Manager position, and that he goes on to only generally mention that Thermo Fisher had positions available after December 2013, but does not specifically identify them. [Filing No. 80 at 17.]

Mr. Abebe responds that a complaint need only be a short, plain statement of the claim and "is not supposed to contain all of the facts." [Filing No. 96 at 20.] He asserts that because he

complains regarding a continuing course of conduct, "the specificity of pleadings is not a prob-lem." [Filing No. 96 at 20.] He argues that because he alleged in the Complaint that he complained about discrimination after he was hired by Thermo Fisher, and alleged that he filed an EEOC Charge on April 5, 2012 for Thermo Fisher's failure to promote him, his allegations "include the discrimination and retaliation that [he] faced when he applied for the NDPTS Team Leader, Client Services Manager, and CSCM positions [in 2011 and 2012]." [Filing No. 96 at 20.] Mr. Abebe notes that Thermo Fisher deposed him regarding the 2012 EEOC Charge and the positions he applied for in 2011. [Filing No. 96 at 20-21.] He also argues that Thermo Fisher has conceded the earlier positions are included in his claims because Thermo Fisher responded to them in its "Facts Section in its Motion for Summary Judgment." [Filing No. 96 at 21.] He concludes that the positions included in the 2012 EEOC Charge are "part of the 1981 claim and they are back-ground evidence for the Title VII claim." [Filing No. 96 at 21.]

On reply, Thermo Fisher argues that Mr. Abebe "has never made any effort to include his July 2010 hire, September 2011 applications for the NDPTS Team Leader and Client Services Manager positions, or his January 2012 application for the Clinical Supply Chain Manager position in his lawsuit…." [Filing No. 98 at 7.]

In the Complaint, Mr. Abebe mentions his first EEOC Charge, and applying for the Client Services Manager position in 2013, being offered a retention bonus in December 2013 when Thermo Fisher informed him his position would be eliminated, and that Thermo Fisher "hired younger white American-born employees for other positions, but…did not hire [him]." [Filing No. 57 at 3.] He also mentions that he filed EEOC Charges in March 2014, July 2014, and No-vember 2014, and that Thermo Fisher gave him a bad performance review, denied him a merit raise for 2014, made allegations against him that were false, and caused other employees to speak

to him differently than they had previously spoken to him. [Filing No. 57 at 4.] He alleges that Thermo Fisher denied him a retention bonus, severance pay, and the extension of his employment past July 2015. [Filing No. 57 at 5.]

The Court finds that Mr. Abebe has not alleged claims relating to his initial hiring by Thermo Fisher, his applications for the 2011 Client Services Manager and NDPTS Team Leader positions, or his application for the January 2012 Clinical Supply Chain Manager positions in the Complaint. While it is true that Federal Rule of Civil Procedure 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007), a complaint must also plausibly state an entitlement to relief, *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012). Mr. Abebe's Complaint is devoid of any mention of discrimination related to his initial hiring by Thermo Fisher or the 2011 and 2012 positions.[4] Although he mentions his internal complaints regarding discrimination and his April 2012 EEOC Charge, Mr. Abebe does not provide any detail whatsoever that would indicate that his claims relate to his initial hiring and his applications for the 2011 and 2012 positions. [Filing No. 57 at 2-3.] In any event, however, the Court will also address whether these claims are time-barred.

b. <u>Whether Claims are Time-Barred</u>

Thermo Fisher also argues that any claims related to Mr. Abebe's September 2011 applications for the NDPTS Team Leader and Client Services Manager positions and his January 2012 application for the Clinical Supply Chain Manager position are time-barred because he received a Right to Sue letter relating to these positions in December 2012, but Mr. Abebe did not file this

---

[4] The Court need only consider the operative Complaint, [Filing No. 57], in connection with the pending Motion for Summary Judgment, but notes that both Mr. Abebe's initial Complaint, [Filing No. 1], and his First Amended Complaint, [Filing No. 27], contain substantially identical allegations to the operative Complaint in that they mention the same positions and time frames.

lawsuit until February 2015 – more than two years later, and after the 90-day limitations period had expired.  [Filing No. 80 at 21.]  It also asserts that any § 1981 claims relating to these positions are time-barred because Mr. Abebe has not pled any facts related to his application for these positions in his initial Complaint or the current Complaint, and so has not asserted § 1981 claims within the four-year statute of limitation.  [Filing No. 80 at 21.]

In response, Mr. Abebe contends that § 1981 claims relating to his application for the September 2011 NDPTS Team Leader and Client Services Manager positions, and for the January 2012 Clinical Supply Chain Manager position, are not time-barred.  [Filing No. 96 at 19.]  He argues that he alleged § 1981 claims related to those positions in his Complaint and, thus, complied with § 1981's four-year limitations period.  [Filing No. 96 at 21.]

On reply, Thermo Fisher argues that Mr. Abebe did not file an EEOC Charge relating to his initial hiring so cannot assert Title VII or ADEA claims related to his initial hiring, and that any § 1981 claim relating to his initial hiring is time-barred because he did not file his initial complaint until February 2015.  [Filing No. 98 at 7.]  It also contends that Mr. Abebe does not dispute that any Title VII or ADEA claims relating to the 2011 and 2012 applications are time-barred.  [Filing No. 98 at 7.]  Thermo Fisher concludes that Mr. Abebe "is left to argue only that his Complaint is sufficiently broad to include Section 1981 claims relating to the 2011 and 2012 decisions."  [Filing No. 98 at 7.]  Thermo Fisher argues that these § 1981 claims are barred as well, though, because they were not asserted in the initial complaint as to the 2011 and 2012 positions. [Filing No. 98 at 7.]

The Court first considers Mr. Abebe's Title VII and ADEA claims related to his initial hiring and 2011 and 2012 applications.  An employment discrimination lawsuit brought under Title VII or the ADEA must be filed in a district court within 90 days after the receipt of a right to

sue notice from the EEOC.  *See Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 270 (7th Cir. 2004); 42 U.S.C. § 2000e-5(f); 29 U.S.C. § 626(e).  Mr. Abebe does not appear to dispute that he did not file his lawsuit within 90 days of receiving the December 2012 Right to Sue Letter – which addressed his April 2012 EEOC Charge.  [*See* Filing No. 96 at 19-21 (Mr. Abebe only arguing that § 1981 claim is not time-barred, and noting that the 2011 and 2012 "non-selections" are "background evidence for the Title VII claim").]  The Court finds that any Title VII or ADEA claims related to Mr. Abebe's initial hiring by Thermo Fisher and his applications for the 2011 and 2012 positions are time-barred because he did not assert them in a lawsuit filed within 90 days of receiving the December 2012 Right to Sue Letter.

As for § 1981 claims relating to his initial hire and the 2011 and 2012 positions, the Court notes that Mr. Abebe did not need to obtain a Right to Sue Letter from the EEOC in order to include those claims in his lawsuit.  *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007) (§ 1981 "does not require a plaintiff to bring an EEOC charge before filing a claim in federal court").  Accordingly, the Court turns to whether Mr. Abebe alleged § 1981 claims relating to his initial hiring and the 2011 and 2012 positions within the applicable four year statute of limitations. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004) (§ 1981 claim is subject to four-year statute of limitations).

Mr. Abebe filed his initial complaint on February 11, 2015.  [Filing No. 1.]  Accordingly, any § 1981 claims related to his initial hiring at Thermo Fisher are time-barred because they were not filed within four years of his initial hire (in April 2010).  Retaliation claims relating to Mr. Abebe's application for the 2011 and 2012 positions would not be time-barred – the earliest he applied for a position after his initial hire was September 2011, which is within the four years preceding the filing of his initial complaint.

In sum, Mr. Abebe did not allege Title VII or ADEA claims relating to his initial hiring at Thermo Fisher or his application for the 2011 and 2012 positions and, in any event, those claims are time-barred because he did not file suit within 90 days of receiving his Right to Sue Letter from the EEOC. Additionally, § 1981 claims relating to his initial hiring are time-barred. Although § 1981 claims relating to the 2011 and 2012 positions would not be time-barred, Mr. Abebe did not allege those claims in the operative Complaint. Accordingly, the Court will begin its analysis with the period following Mr. Abebe's receipt of the December 2012 Right to Sue Letter, and will consider the positions that he applied for thereafter.

### 2. Merits of Mr. Abebe's Claims

Thermo Fisher argues in connection with each position for which Mr. Abebe applied that it ultimately selected someone who was more qualified, was more interested in the position, and who performed better in the interview. It also notes that it selected another male for several of the positions, so Mr. Abebe's gender discrimination claim fails as it relates to those positions. In response, Mr. Abebe relies primarily on his own testimony and a chart he created to argue that he, in fact, was the more qualified candidate. He also argues that Thermo Fisher was retaliating against him for his internal complaints and his EEOC Charges and that, in connection with some positions, Thermo Fisher set him up to fail. The Court will consider each position for which Mr. Abebe applied in turn, after setting forth the law applicable to each type of claim.

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees…because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The ADEA makes it unlawful for an employer to take an adverse employment action against an individual "because of such individual's age." 29 U.S.C. § 623(a)(1); *see also Ripberger v.*

*Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014). The ADEA's protections extend to individuals who are 40 years of age and older. 29 U.S.C. § 631(a). 42 U.S.C. § 1981 prohibits an employer from retaliating against an employee for engaging in a statutorily protected activity.

The same framework is used for evaluating Title VII, ADEA, and retaliation claims. *David v. Board of Trustees of Community College District No. 508,* --- F.3d ----, 2017 WL 129114, *5 (7th Cir. 2017); *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). A plaintiff can prove Title VII, ADEA, or retaliation claims under either the direct or indirect method of proof. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1157 (7th Cir. 2014) (age discrimination); *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009) (race and national origin discrimination); *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1068 (7th Cir. 2012) (retaliation). The Seventh Circuit recently instructed that, under the direct method, courts should consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).[5]

---

[5] *Ortiz* disapproved of prior efforts on the part of district courts to "shoehorn all evidence into two 'methods,' and [their] insistence that either method be implemented by looking for a 'convincing mosaic,'" because that approach "detracted attention from the sole question that matters: Whether a reasonable juror could conclude that [plaintiff] would have kept his job if he [was not a member of a protected class] and everything else had remained the same…." This Court reads *Ortiz* as a shift from treating "direct" and "indirect" evidence differently, and not as creating a standard different from the two-option test whereby a plaintiff can either prove discrimination by the "direct method," or the "indirect burden-shifting method" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ortiz*, 834 F.3d at 766 ("Today's decision does not concern *McDonnell*

Under the indirect method, a plaintiff can rely on the *McDonnell Douglas* burden-shifting method of proof. *Antonetti*, 563 F.3d at 591 (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a prima facie case of discrimination for failure to promote, a plaintiff must show that: "(1) [he] was a member of a protected class; (2) [he] was qualified for the position sought; (3) [he] was rejected for the position; and (4) the employer promoted someone outside of the protected group who was not better qualified for the position that [he] sought." *Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2016). Where a plaintiff is attempting to prove reverse discrimination with regard to gender, as Mr. Abebe is here, the first part of the *McDonnell Douglas* template is altered and requires that the plaintiff show either that the facts at hand seem particularly dubious or that there is something in the background of the employer that would demonstrate a reason or inclination to discriminate against males. *See Ballance v. City of Springfield*, 424 F.3d 614, 617-18 (7th Cir. 2005). For a prima facie case of retaliation, a plaintiff must show that: "(1) he engaged in [statutorily] protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the two." *Poullard*, 829 F.3d at 856.

Once a plaintiff establishes a prima facie case, the burden "then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. If the employer satisfied its burden, the burden shifts back to the plaintiff to prove that the proffered reason was pretextual." *Walker v. Glickman*, 241 F.3d 884, 889 (7th Cir. 2001) (citation omitted). Pretext is

---

*Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand. We are instead concerned about the proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently. Instead, all evidence belongs in a single pile and must be evaluated as a whole"); *David*, 2017 WL 129114 at *4 ("*Ortiz*, however, did not alter '[t]he burden-shifting framework created by *McDonnell Douglas*….' As we have explained, both before and after *Ortiz*, *McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases").

defined as "a dishonest explanation, a lie rather than an oddity or an error." *Sweatt v. Union Pacific R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015) (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002)).  To establish pretext, the plaintiff must show either that the employer was motivated by a discriminatory reason or that the proffered reason is "unworthy of credence." *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675-76 (7th Cir. 2003).  An employer's changed reasoning or failure to proffer an explanation when given an opportunity to do so can be evidence of pretext.  *Id.*

The Court will analyze this case as it has other employment discrimination cases, keeping in mind the Seventh Circuit's admonition in *Ortiz* to consider all evidence as a whole, rather than categorizing evidence by type.[6]  The Court will separately consider each adverse employment action Mr. Abebe alleges he suffered, as the parties have done.[7]  The Court notes at the outset, however, that as it evaluates the various positions for which Mr. Abebe applied, it will adhere to the

---

[6] Mr. Abebe states in his Statement of Claims that "the legal theories are discrimination, harassment, and retaliation under the direct method using both direct and circumstantial evidence, the indirect method using both direct and circumstantial evidence, and the totality of the evidence combining the direct and indirect methods using both direct and indirect evidence…." [Filing No. 34 at 1.]

[7] In every instance, Thermo Fisher offered the candidate it ultimately selected for the various positions a salary that was lower than Mr. Abebe's then-current salary.  Save for two of the positions, Thermo Fisher has not argued that rejecting Mr. Abebe was not an adverse employment action.  Accordingly, the Court will assume for purposes of analyzing the Motion for Summary Judgment that each time Thermo Fisher selected another candidate for those positions, Mr. Abebe suffered an adverse employment action.  As for the two positions where Thermo Fisher argues that selecting another candidate was not an adverse employment action because, among other reasons, the salary was less than Mr. Abebe's – the December 2013 Quality Assurance Representative position and the December 2013 Associate Clinical Supply Chain Manager position – the Court concludes below that Mr. Abebe has not presented any evidence of discrimination or retaliation in connection with those positions in any event.  Thus, the Court need not consider whether rejecting Mr. Abebe for those positions constituted adverse employment actions.

Seventh Circuit's statement that "we 'do not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination….'" *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001).

### a. October 2013 Client Services Manager Position

Thermo Fisher ultimately hired Mr. Turner for the Client Services Manager position, so Mr. Abebe's gender discrimination claim fails as matter of law because he cannot show that Thermo Fisher hired someone outside of his gender. As for his age, race, and national origin discrimination claims, Mr. Abebe has not presented any evidence that those factors played any part in Thermo Fisher's decision. Mr. Abebe only cites to his own testimony to support his argument, and a chart he prepared comparing his "education and experience" with the "data for applicant selected." [*See* Filing No. 96 at 28 (citing Filing No. 93-1 (Mr. Abebe's Affidavit) and Filing No. 93-2 (Mr. Abebe's chart)).] But he ignores evidence presented by Thermo Fisher that Ms. Griffith was specifically looking for someone with PPI experience, that Mr. Turner had PPI experience and Mr. Abebe did not,[8] and that Mr. Turner performed well during the interview while Mr. Abebe did not. Mr. Abebe also has not presented any evidence that Thermo Fisher somehow groomed Mr. Turner for the position, and his saying so is not sufficient to overcome summary judgment. Mr. Abebe simply has not presented any evidence that Thermo Fisher acted in a discriminatory manner when it selected Mr. Turner for the Client Services Manager position instead of him.

Further, even if Mr. Abebe had presented evidence supporting a prima facie case, Thermo Fisher has presented evidence demonstrating that it had a non-discriminatory reason for hiring Mr.

---

[8] Mr. Abebe states in his response brief that he "had done PPI for years as [a] team leader and manager," but cites only to Mr. Turner's resume which reflects Mr. Turner's PPI experience. [Filing No. 96 at 14-15 (citing Filing No. 93-12 at 6-7).]

Turner – it believed him to be more qualified and a better fit for the position. *See O'Regan*, 246 F.3d at 984 ("our only concern is the honesty of the employer's explanation…. And there is no indication in the record that [the employer] did not honestly believe [its actions were correct]") (citations and quotations omitted); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) ("it is not our role to determine the competency of or interfere in employment decisions simply where we believe an employer has made a poor choice. Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair"). Again, the relevant focus is on whether Thermo Fisher has presented a non-discriminatory reason for choosing the other candidate. Mr. Abebe's opinion that he was more qualified than Mr. Turner is not sufficient to overcome summary judgment where, as here, he has not presented any evidence that Thermo Fisher failed to select him based on discriminatory reasons, and Thermo Fisher has presented evidence that it selected Mr. Turner because it found him to be more appropriate for the position. *See Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir. 2000) ("Discrimination laws serve only to prevent consideration of forbidden characteristics – like race – but they are not, we have repeatedly noted, court-enforced merit selection programs"); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001) ("[plaintiff's] subjective belief that she was better qualified than [the candidate defendant selected] does not, without more, demonstrate pretext").

Similarly, Mr. Abebe has not presented any evidence that Thermo Fisher did not select him for the Client Services Manager position as retaliation for his prior complaints about discrimination. Mr. Abebe only argues that "the timing of the retaliation [not being selected for the position] was not only very close in time – the retaliation…began during his complaints before any resolu-

tion of his complaints was proposed by [Thermo Fisher] and continued on through retaliatory personnel documents damaging his career advancement." [Filing No. 96 at 28.] In fact, the timing was not "close in time." Mr. Abebe's internal complaint was in October 2011, and he filed his first EEOC Charge in April 2012 – two years and eighteen months, respectively, before his application for the position. This is not sufficient to show that Thermo Fisher's selection of Mr. Turner was retaliation for Mr. Abebe's complaints. Mr. Abebe's discrimination and retaliation claims related to the October 2013 Client Services Manager position fail as a matter of law.

b. <u>December 2013 Team Leader, Operations Support Position</u>

Mr. Abebe applied for a Team Leader, Operations Support position in December 2013, and Thermo Fisher selected Mr. Craig for the position. Accordingly, his gender discrimination claim fails. Mr. Abebe also has not presented any evidence to establish a prima facie case of discrimination based on his age, race, or national origin. He argues that the posting for the position stated that Thermo Fisher wanted a candidate with experience in pharmaceutical and clinical packaging, so the fact that Mr. Craig has operations and supply chain experience is irrelevant. [Filing No. 96 at 28.] But Mr. King, the Hiring Manager for the position, stated that he did not consider the position to be science-based, but rather was looking for someone with operations and supply chain experience. [Filing No. 79-7 at 2.] Mr. Craig had technical and supply chain experience, and Mr. Abebe did not. [Filing No. 79-7 at 2.] Additionally, notes from Mr. Abebe's interview indicate that he did not understand the position, had not sought out the information before the interview, did not provide clear answers to their questions, and stated that the position was not his first choice. [Filing No. 79-7 at 4; Filing No. 79-7 at 12.] Conversely, the notes from Mr. Craig's interview indicate that he had the appropriate technical and supply chain experience, was a "good motivational fit," his current job had similarities with the position, and he "seemed to be very eager about

the position."  [Filing No. 79-7 at 16; Filing No. 79-7 at 18.]  Mr. Abebe has not presented any evidence to establish a prima facie case of age, race, or national origin discrimination and, even if he had, Thermo Fisher's reason for hiring Mr. Craig – that it believed he was more qualified – is supported by the evidence.  *See Johnson*, 260 F.3d at 733 ("it is not our place to evaluate the wisdom of an employer's business decisions…  We only require that an employer honestly believed its reasons for its actions….").

Further, Mr. Abebe's only argument in support of his retaliation claim related to the Team Leader, Operations Support position is that "inference can be drawn from all of the evidence that [Thermo Fisher] did not like [him] because…he complained about discrimination."  [Filing No. 96 at 29.]  Mr. Abebe does not provide any citation to record evidence for this argument, and his opinion that this is the case is not enough to overcome summary judgment.  Thermo Fisher is entitled to summary judgment on Mr. Abebe's discrimination and retaliation claims related to the Team Leader, Operations Support position.

### c.  December 2013 Quality Assurance Representative Position

In December 2013, Mr. Abebe applied for a Quality Assurance Representative position, but Thermo Fisher selected Ms. Fultz for the position.  Mr. Abebe argues that he had more years of experience in the pharmaceutical industry than Ms. Fultz, and that although the position related to quality, Ms. Fultz did not have science experience or a science background.  [Filing No. 96 at 30.]  The Quality Assurance Representative position involved "carefully reviewing manufacturing and packaging production records to ensure that the records are accurate and error-free.  The role provides a check on the documentation and records created during the manufacturing and/or packaging of clinical trial materials, ensuring that all records are completely accurate in the event of an audit by Eli Lilly & Co. or a regulatory agency," and "requires a close attention to detail."  [Filing

No. 79-8 at 1-2.]  Mr. Spindler was the Hiring Manager for the position, and noticed that Mr. Abebe's resume contained several grammatical and typographical errors, which he felt indicated a lack of attention to detail.  [Filing No. 79-8 at 2; Filing No. 79-8 at 8 (Mr. Spindler's interview notes stating "[l]ack of quality experience coupled with many errors/issues with resume do not indicate attention to detail"); Filing No. 79-8 at 9-18 (Mr. Abebe's resume, reflecting grammatical and typographical errors).]  Mr. Spindler also felt that Mr. Abebe was not enthusiastic about the position.  [Filing No. 79-8 at 2.]  Ms. Fultz, on the other hand, had held leadership positions with Thermo Fisher, was enthusiastic about the position during her interview, and had submitted a resume that was free from errors.  [Filing No. 79-8 at 2-3.]  Again, Mr. Abebe has not presented any evidence that Thermo Fisher's decision to hire Ms. Fultz was based on discriminatory reasons and, in fact, Thermo Fisher has presented valid reasons for selecting Ms. Fultz.  *See Stockwell v. City of Harvey*, 597 F.3d 895, 903 (7th Cir. 2010) (employer's subjective belief that selected candidate was more qualified or appropriate for position "is sufficient to allow a fact-finder to conclude that…non-discriminatory factors drove the employment decision").[9]

Mr. Abebe does not address his retaliation claim related to the Quality Assurance Representative position, but the record evidence does not indicate that Mr. Abebe's previous internal complaints or EEOC Charges played any role in Thermo Fisher's selection of Ms. Fultz.  Mr. Abebe's discrimination and retaliation claims related to this position fail as a matter of law.

---

[9] Mr. Abebe also has not presented any evidence supporting a reverse gender discrimination claim in connection with this position.  He has not even attempted to demonstrate that the facts at hand seem particularly dubious, or that there is something in Thermo Fisher's background that would demonstrate a reason or inclination to discriminate against males.  *See Ballance,* 424 F.3d at 617-18.

d.  December 2013 Associate Clinical Supply Chain Manager Position

Mr. Abebe applied for an Associate Clinical Supply Chain Manager position in December 2013, but Thermo Fisher ultimately did not fill the position.  Mr. Abebe argues that the fact that Thermo Fisher did not fill the position "is even more evidence of discrimination and retaliation, because Abebe was very qualified for the position, and [Thermo Fisher] did not place him in the position, and instead, never filled it."  [Filing No. 96 at 30.]  But Mr. Abebe has not presented any evidence tying the decision not to fill the position to him – and much less to his gender, age, race, or national origin.  Indeed, he cannot establish a prima facie case relating to this position because he cannot show that Thermo Fisher hired someone outside his protected class for the position – it did not hire anyone at all.  *See Sweatt*, 796 F.3d at 709.[10]  Simply stating that not filling the position is "more evidence" of discrimination is not enough to overcome summary judgment on either Mr. Abebe's discrimination or retaliation claims relating to the Associate Clinical Supply Chain Manager position.

e.  December 2014 Clinical Supply Chain Manager

In December 2014, Mr. Abebe applied for a Clinical Supply Chain Manager position, and Thermo Fisher selected Mr. Lozito, a 57-year old male.  His gender discrimination claim related to this position fails since Thermo Fisher ultimately selected a male, and his age discrimination claims fail as well since Mr. Lozito was only four years younger than Mr. Abebe when he was selected.  *See Balderston v. Fairbanks Morse Engine Div. of Coltec Industries*, 328 F.3d 309, 321 (7th Cir. 2003) ("[i]n the age discrimination context, the fact that a plaintiff is replaced by someone

---

[10] Although a plaintiff can establish a prima facie case of discrimination by showing that a position remained open, as opposed to showing that a similarly situated person outside the protected class was hired, *Sweatt*, 796 F.3d at 709, that was not the case here.  Thermo Fisher cancelled the requisition for the position, and it was closed rather than left open to eventually fill.

'substantially younger' is a reliable indicator of age discrimination…. The Seventh Circuit has defined 'substantially younger' as generally ten years younger"). As for race and national origin discrimination, Mr. Abebe argues that he was more qualified than Mr. Lozito, that Thermo Fisher "concealed information from [Mr.] Lozito," and that Thermo Fisher should have contacted him when Mr. Lozito later quit to offer him the position. [Filing No. 96 at 31.] Again, the evidence indicates that Thermo Fisher selected Mr. Lozito because it determined that he was more qualified – he had nine years of supply chain management experience that was directly relevant to the position, and Mr. Abebe did not. [Filing No. 79-5 at 2.] *See Sembos v. Philips Components*, 2003 WL 1342985, *7 (N.D. Ill. 2003) (plaintiff's subjective opinion that he was qualified for eight positions he applied for and did not get was "based…solely on his subjective understanding of his own skills without consideration as to the specific requirements of these eight jobs," and was not enough to overcome summary judgment where defendant presented evidence that he was not, in fact, qualified). And while Mr. Lozito did resign several months after accepting the Clinical Supply Chain Manager position, the evidence shows that he did so for health reasons and not because Thermo Fisher "treated [him] badly" as Mr. Abebe claims. [Filing No. 93-41 at 5.] The Court fails to see how Mr. Lozito's resignation for health reasons could show that Thermo Fisher discriminated against Mr. Abebe when it selected Mr. Lozito over him.

As to his retaliation claim, Mr. Abebe argues that he filed an EEOC Charge in November 2014 and received a Right to Sue Letter the same month, and that this was immediately before he applied for the position. [Filing No. 96 at 31.] This timing, without more, is not enough to survive summary judgment. *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012) ("Because evidence regarding suspicious timing, without more, is generally insufficient to support a reasonable inference of retaliation, we conclude that [plaintiff] has failed to establish a prima facie case

of retaliation…."). Mr. Abebe's discrimination and retaliation claims related to the December 2014 Clinical Supply Chain Manager position do not survive summary judgment.

### f. Mr. Abebe's Retention Bonus

When it became clear that Lilly was going to reabsorb the jobs in Thermo Fisher's NDPTS group, all NDPTS group employees – including Mr. Abebe – were offered a $57,750 retention bonus. [Filing No. 79-2 at 4.] Mr. Abebe argues that he was treated differently than other employees because the retention bonus was only about sixty percent of his salary, while "NDPTS Associate Pete Hollingsworth told Abebe that Hollingsworth would be receiving a year's salary as a bonus…." [Filing No. 96 at 31.] The Court does not find it significant that the retention bonus was a larger percentage of some NDPTS group employees' salaries than it was of Mr. Abebe's salary. And even if the percentage were significant, Mr. Abebe has not provided any evidence regarding the age, race, or national origin of Mr. Hollingsworth, so has not shown that he was outside of Mr. Abebe's protected classes (he was also a male, so any gender discrimination claim fails). [See Filing No. 96 at 31-32 (Mr. Abebe relying on his deposition testimony, [Filing No. 93-4 at 40], wherein he states that a "fellow NDP Trial Support Associate" was offered a bonus that "must have been pretty close to whatever his salary was").] Mr. Abebe has not established a prima facie case of discrimination related to the retention bonus he was offered, nor has he demonstrated that the amount of the retention bonus was tied in any way to his past internal complaints or EEOC Charges. Any discrimination or retaliation claims relating to his retention bonus fail as a matter of law.

### g. Position Elimination

Mr. Abebe's position was eliminated – along with the rest of the NDPTS group – as a result of Lilly's reabsorption of the positions. Mr. Abebe argues that "[t]hrough a series of actions,

[Thermo Fisher] groomed, promoted, transferred, and found positions for all of the NDPTS employees except for Abebe, the only other African-American employee…; [another employee] who was also older; and one white employee whom [Thermo Fisher] had written in his personnel documents had 'peculiar behavior.'" [Filing No. 96 at 32.] The only evidence Mr. Abebe cites that could show what happened to other NDPTS employees after their positions with Thermo Fisher were eliminated is a spreadsheet which Mr. Abebe has made no effort to explain. The Court cannot discern what exactly the spreadsheet reflects and, specifically, whether it reflects that every NDPTS employee other than Mr. Abebe, the other African-American employee, and the white employee who allegedly had "peculiar behavior" found positions within Thermo Fisher after their positions were eliminated.[11] The evidence shows that all NDPTS group jobs at Thermo Fisher were eliminated, and Mr. Abebe has not presented any evidence indicating that he was treated any differently than the other NDPTS group employees. Discrimination or retaliation claims fail related to his position elimination.

h. Severance Package

Mr. Abebe's final discrimination and retaliation claims relate to Thermo Fisher's offer of an additional retention bonus, severance benefits, and a short extension of his position elimination provided he sign a severance agreement. Mr. Abebe argues that although all other NDPTS employees had to sign the same severance agreement to receive the benefits, "that agreement did not have the same impact on the other employees because they did not have a pending lawsuit against [Thermo Fisher] for discrimination." [Filing No. 96 at 33.] He argues that Thermo Fisher required

---

[11] For example, the spreadsheet shows a column titled "Choice A" and for Mr. Abebe and three other employees the choice listed is "CSOS." [Filing No. 93-32 at 3.] Mr. Abebe does not explain what "CSOS" means, nor what some of the other listed choices mean, such as "LPC." It was his burden to do so.

him to sign the severance agreement – which included a release of claims – as retaliation for filing this lawsuit. [Filing No. 96 at 33.]

Again, Mr. Abebe has not presented any evidence showing that Thermo Fisher treated him any differently than the other NDPTS group employees when it required him to sign a severance agreement releasing all claims in order to receive the additional retention bonus, severance benefits, and a short extension of his position elimination. Thermo Fisher was well within its rights to require the NDPTS group employees, including Mr. Abebe, to sign a severance agreement. If Thermo Fisher had not required Mr. Abebe to sign the severance agreement, it would have been treating him more favorably than the other NDPTS group employees. This, Thermo Fisher was not required to do. *See Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 793 (7th Cir. 2005) (retaliation claim brought by plaintiff whose position was eliminated based on employer's requirement that she sign a severance agreement if she wanted to remain employed in another position failed; court stated "[plaintiff] was not a victim of retaliation. Her reason for termination was the same for all employees…who were similarly situated. She had four options. Three of those options had various incentives and benefits in exchange for the release…. An employee who refuses to sign a release will not be offered the same deal as a terminated employee who is willing to sign the release"); *Gray v. N. Telecom, Inc.*, 1998 WL 386359, *8 (N.D. Ill. 1998) (granting summary judgment in favor of defendant on plaintiff's retaliation claim where defendant required all employees to sign release of claims to receive severance benefits; court stated "[plaintiff] has not shown that [defendant] offered severance to any employee who left voluntarily and did not sign a release of claims against the company").

Mr. Abebe's discrimination and retaliation claims related to Thermo Fisher's requirement that he sign a severance agreement to receive an additional retention bonus, severance benefits,

and a short extension of his position elimination fail because all NDPTS group employees were required to sign the same agreement, and Mr. Abebe has not presented any evidence indicating that Thermo Fisher required him to sign the agreement for discriminatory or retaliatory reasons.

In sum, Mr. Abebe has supported his discrimination and retaliation claims relating to the positions for which he applied primarily with his own opinion that he was more qualified than the applicants that Thermo Fisher ultimately selected. For each position, however, Thermo Fisher has presented evidence showing that it selected the other applicant for non-discriminatory reasons – that the individual(s) making the hiring decisions believed the other applicant to be more qualified than Mr. Abebe for the particular position, that the other applicant performed better than Mr. Abebe in the interview, and that unlike Mr. Abebe the other applicant expressed a genuine interest for the position.[12] Further, Mr. Abebe has not demonstrated that Thermo Fisher treated him any differently than the other NDPTS group employees regarding the initial retention bonus, the elimination of his position, and the requirement that he sign a severance agreement releasing claims against Thermo Fisher in order to receive an additional retention bonus, severance benefits, and a short extension of his position elimination. While Mr. Abebe is unhappy with Thermo Fisher's decisions, those decisions are only actionable if they are unlawful, and he has not presented evidence to overcome summary judgment in Thermo Fisher's favor. *See Ptasznik,* 464 F.3d at 697 ("Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair"). This Court will

---

[12] The Court notes that had it considered retaliation claims based on the positions for which Mr. Abebe applied in 2011 and 2012, and which the Court has concluded were not alleged in the Complaint, they would suffer the same fate. Like his retaliation claims based on the other positions for which he applied, Mr. Abebe has not presented any evidence that Thermo Fisher's decision not to hire him for the 2011 and 2012 positions was retaliation for his earlier internal complaints or EEOC Charge.

not second-guess Thermo Fisher's personnel decisions where Mr. Abebe has not presented any evidence that those decisions were motivated by discrimination or retaliation. *O'Regan*, 246 F.3d at 984.

## III.
### CONCLUSION

For the foregoing reasons, the Court:

- **GRANTS IN PART** Thermo Fisher's Motion to Strike, [Filing No. 100], to the extent that it strikes the portions of Mr. Abebe's surreply that do not relate to the Second Declaration of Virginia Campbell, but **DENIES IN PART** the Motion to Strike, [Filing No. 100], to the extent that it declines to strike the portions of the surreply that relate to the Second Declaration of Virginia Campbell; and

- **GRANTS** Thermo Fisher's Motion for Summary Judgment, [Filing No. 79]. Final judgment shall enter accordingly.

Date: 1/31/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**